**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |  |
|---|---|---|
| SAMANTHA MOUNTFORD AND DARRIN ILLGES, | ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | Civil No. 1:19-cv-530 Hon. Liam O'Grady |
| LTD, INC. AND FCA US, LLC, | ) ) | |
| *Defendants.* | ) ) ) | |

**MEMORANDUM OPINION AND DISMISSAL ORDER**

For the reasons stated below, the Court granted Defendants' Motion for Summary

Judgment on February 21, 2020, on the issues of liability and damages for all claims asserted by

Plaintiffs. Dkt. 46. On February 20, 2020, Defendants moved for leave to file a supplement to

their motion for summary judgment, which the Court granted. While the supplement (Dkt. 44)

raises meritorious arguments and is considered with respect to Plaintiffs' credibility, the Court

denies summary judgment on the merits of the initial motion; the supplement is unnecessary for

resolution of the issues. The Court likewise dispensed with oral argument as it would not aid in

the decisional process.

## I. MATERIAL UNDISPUTED FACTS

On July 10, 2015, Plaintiffs purchased a 2015 EcoDiesel Dodge Ram 1500 ("the

Vehicle" or "the Truck") at Defendant LTD, Inc.'s dealership d/b/a Lustine Chrysler, Dodge,

Jeep, Ram ("Lustine") in Woodbridge, Virginia. The Retail Installment Sale Contract ("Sale

Contract") reflects the total sale price, $75,459.72. Compl. ¶ 4. The Truck was sold with an

express limited written warranty issued by the manufacturer, Defendant FCA US, formerly Chrysler Group LLC ("Limited Warranty"). Plaintiffs received a copy of the Limited Warranty. Dkt. 32 ¶¶ 6-7, Undisputed Material Facts ("UMF"). The Limited Warranty states, "your warranties don't cover any part that was not on your vehicle when it left the manufacturing plant or is not certified for use on your vehicle. Nor do they cover the costs of any repairs or adjustments that might be caused or needed because of the installation or use of non-Chrysler parts, components, equipment, materials, or additives." Dkt. 32, Ex. 6 at 13. It goes on to name Other Exclusions, explaining, "Your warranties don't cover the costs of repairing damage or conditions caused by any of the following: . . . tampering with the emission systems, or with a part that could affect the emission systems," or "any changes made to your vehicle that don't comply with Chrysler." *Id.* at 16.

Plaintiffs also received a copy of the Vehicle's Owner's Manual, with a diesel supplement. The section titled "Maintaining Your Vehicle" includes a message marked "CAUTION!" It reads, in part: "Immediately have potential malfunctions examined by an authorized dealer or qualified repair center." Dkt. 32, Ex. 9 at 754. The manual also says, "[d]amage or failures caused by the use of non-MOPAR® parts for maintenance and repairs will not be covered by the New Vehicle Limited Warranty."[1] *Id.* at 753. Near the start of the diesel supplement, there is a message from FCA US LLC, including,

> NOTE:
> - Some aftermarket products may cause severe engine/transmission and/or exhaust system damage. Your vehicle's Powertrain Control Systems can

---

[1] There are several limited express warranties Chrysler Group LLC makes for the Vehicle. They include, in relevant part: Basic Limited Warranty (until the earlier of three years or 36,000 miles; Anti-Corrosion Limited Warranty (three years for all panels, five years for outer panels); Powertrain Limited Warranty (until the earlier of five years or 100,000 miles); and federal emissions limited warranties. The Court understands the reference to the "New Vehicle" limited warranty to include all of these, and that the Powertrain Limited Warranty was operative.

2

> detect and store information about vehicle modifications that increase horsepower and torque output such as whether or not performance-enhancing powertrain components, commonly referred to as downloaders, power boxes, or performance chips have been used.
>
> * * *
>
> This information may be used to determine if repair will be covered by the New Vehicle Limited Warranty.

Dkt. 32, Ex. 10 at 8-9.

At the time of sale, Plaintiffs paid for a service contract, and Plaintiff Illges consistently had his oil changed at Lustine. Dkt. 37 ¶ 11, Plaintiffs' Uncontested Facts ("PUF"). Lustine also performed annual emissions and safety inspections on the Vehicle. Plaintiff Illges performed his own filter changes, transmission fluid changes, oil checks, and other routine and minor maintenance on the vehicle. *Id.*[2]

On or before August 14, 2016, Plaintiff Illges deleted the Vehicle's exhaust gas regulation ("EGR") system, altering the relevant software "to allow the Vehicle to operate without the emissions system." *Id.* ¶ 9. Plaintiffs installed an aftermarket, non-FCA PPEI EcoDiesel Single Tune software update. This update to the Truck added an additional 60 horsepower. The parties stipulate to the additional 60 horsepower (Dkt. 29), though Plaintiffs dispute whether "there was indeed any increase in the power." Dkt. 37 at 9 (disputing

---

[2] Plaintiff Illges provides inconsistent statements about how much maintenance he personally performed on the Truck. In the Complaint, Plaintiffs represent to the Court that "[a]ll service on the Vehicle was performed at Dealership Defendant [Lustine]." Compl. ¶ 10. This is plainly contradicted throughout the record, as the Opposition states Plaintiff Illges performed all the tasks listed above. The Opposition also includes the fact that, "[i]n 2015, while regularly maintaining his Vehicle, Mr. Illges noticed a hot, ambient feel near the Vehicle's engine." PUF ¶ 4 (emphasis added); *see also* Dkt. 37, Ex. 2 at 1 (relaying, in Plaintiffs' expert Justin Farmer's report, "Mr. Illges informed me that all maintenance was performed at the dealership, with the exception of fuel filter changes that he performed himself every 10,000 miles."); Dkt. 32-14, Illges Dep. 34:2-6 (Q: Had you done any maintenance yourself on the vehicle? A: I've done fuel filter changes; I've changed drive train fluids, very minor maintenance and routine maintenance."). The Court is convinced Plaintiff Illges performed maintenance on the Vehicle, and the information in the Opposition, included above, is the most detailed account.

3

Defendants Fact 74). Plaintiffs also removed the Vehicle's Selective Catalytic Reduction system, the Diesel Particulate Filter, and the emission system's components with the exception of the crankcase ventilation system. Plaintiff also replaced the Truck's exhaust, changing the original dual-exhaust to a single exhaust. Plaintiff Illges made these modifications personally. UMF ¶¶ 30-33. The Vehicle's oil changes and inspections at Lustine continued after the modifications. PUF ¶¶ 11-12.

On August 6, 2018, Plaintiff Illges was driving the Truck at highway speed on a trip from Virginia to Pennsylvania when he heard a pop-like sound; upon hearing the sound, the engine shut down and the Vehicle's electrical power was all that remained functional. Plaintiff Illges coasted to a stop on the shoulder, where he noticed a large pool of oil under the Truck. Next, C. Harper Automotive Group ("C. Harper"), an authorized FCA US dealer, towed the Truck to its local dealership. UMF ¶ 41. At C. Harper, FCA denied warranty coverage, citing Plaintiffs' tampering with the Vehicle's emissions system. Plaintiffs presented the Truck to multiple dealership locations and FCA representatives, and all declined to cover the repairs due to the modifications to the Vehicle. UMF ¶¶ 42-43.

The Parties disagree as to the cause of the overall engine failure, specifically whether it was due to oil starvation unrelated to Plaintiffs' modifications. Technically, there was failure of the number five rod bearing. PUF ¶ 26. The morning leading up to the failure, Plaintiff Illges drove 250 miles over the course of four hours, and there were no indicator lights or reported problems with the Vehicle leaking—or consuming too much—oil prior to the engine shutting down.[3] UMF ¶¶ 37-39. In late September 2018, Plaintiffs received an estimate for repairs to the

---

[3] While Plaintiffs' expert raises a question as to whether an indicator light was on, Plaintiff Illges testified, "Q: Were there any warning lights on the dash? A: There were not." Dkt. 32-14, Illges Dep. 33:4-5.

4

engine at Dulles Motorcars in Leesburg, Virginia, for $17,776.00. Compl. ¶ 25. No repairs have been made, and the Truck has not been operable since the August 2018 failure. Plaintiffs allege additional consequential, actual, and incidental damages.

In November 2018, approximately three months after the failure of the engine on the 2015 Dodge Ram 1500, Plaintiff Illges purchased another Dodge Ram truck – a 2018 Dodge Ram 2500. Dkt. 32-14, Illges Dep. 10:18-20.

Plaintiffs allege four counts: (I) Breach of Express Warranty; (II) Breach of Implied Warranty; (III) Breach of Service Warranty, as to Dealership Defendant; (IV) Violation of Virginia Consumer Protection Act. Defendants removed the case to this Court from the Circuit Court for Prince William County, Virginia, then moved jointly for summary judgment.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a). The trial judge is not required to make findings of fact at the summary judgment stage. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). While the burden is on the moving party to demonstrate entitlement as a matter of law, the opposing party "must 'set forth specific facts showing that there is a genuine issue for trial.'" *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (quoting *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003)). The Court construes the evidence in the light most favorable to the nonmoving party and

5

draws all reasonable inferences in its favor. *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 150 (4th Cir. 2012) (citation omitted).

## III. DISCUSSION

Plaintiffs contend "the actual cause of the Vehicle's failure is a material fact in dispute and this Court should deny Defendants' Motion." Dkt. 37 at 11. The legal claims Plaintiffs allege, however, do not ask the Court to determine the cause of the engine failure. The Court faces a slightly different question: whether Defendants have sufficiently demonstrated a breach of a valid warranty, or a violation of consumer protection laws. This discussion considers the validity of each alleged warranty before examining any potential breach or misrepresentation in each Count. Ultimately, the Court finds there was no breach or violation, and no genuine question of material fact for trial.

The operative Retail Installment Sale Contract ("Sale Contract") is by and between Lustine Dodge Jeep as Seller-Creditor, and Plaintiffs Samantha Mountford and Darrin Illges as Buyer and Co-Buyer, respectively. Dkt. 32, Ex. 5 at Pls.' Doc. 1000216. The Sale Contract clearly states:

> Unless the Seller makes a written warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose. Any implied warranties arising from a written warranty or service contract are limited to the duration of such written warranty or service contract.
> *This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide.*

*Id.* at Pls.' Doc. 1000220 (emphasis added). In other words, this clause expressly disclaims all warranties pursuant to section 2308 of the Magnusson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301 *et seq.*, and expressly contemplates manufacturer warranties as separate from and

unaffected by the Sale Contract with the dealership. There is no indication of a written warranty related to Lustine as the Seller-Creditor.

The Sale Contract shows clear intent to disclaim any Seller Warranties, subject to exceptions that do not apply to express warranties. Dkt. 32, Ex. 5 at Pls.' Doc. 1000220 ("Unless the Seller makes a written warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle..."). Furthermore, the facts do not include any promises or affirmative representations by Lustine regarding the vehicle before sale; there is no indication Plaintiffs relied on any specific representation in a bargaining process.[4] Consequently, Plaintiffs did not adequately allege and, therefore, the Court cannot find that there was an express warranty through bargaining at the time of sale. *See Kraft Foods N. Am.*, 446 F. Supp. 2d at 570 ("'The issue whether a particular affirmation of fact made by the seller constitutes an express warranty is generally a question of fact.'") (quoting *Bayliner Marine Corp. v. Crow*, 509 S.E.2d 499, 502 (Va. 1999)).

---

[4] The Virginia Code recognizes that "[u]nder the UCC, '[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." *Kraft Foods N. Am., Inc. v. Banner Eng'g & Sales, Inc.*, 446 F. Supp. 2d 551, 570 (E.D. Va. 2006) (quoting Va. Code § 8.2-313(1)(a)). Put simply, in this case there is no alleged bargain beyond the scope of the Sale Contract—which disclaims any Seller warranties—and thus no affirmation of fact or promise that might serve as the basis of such a claim. *See* Dkt. 32, Ex. 5 at Pls.' Doc. 1000220. The only details surrounding the actual purchase of the vehicle are the parties to the sale, the Retail Installment Sale Contract, and that the "purchase was subject to a Manufacturer Defendant vehicle warranty and a Dealer Defendant service contract pursuant to the Warranty Information document attached to the Sale Contract ('Warranty')." Compl. ¶¶ 4-5. Plaintiffs' Opposition merely states, "[a]s part of the sale, Defendants provided express, implied, and service contract warranties on the Vehicle ('the Warranties')." PUF ¶ 1. The more specific information provided in the Complaint is given more weight than the broader claims.

7

Nor is there sufficient evidence that Lustine, as Plaintiffs assert, "issued Plaintiffs an express *service warranty* at the time of sale, constituting an express warranty under Va. Code § 8.2-313 and 15 U.S.C. § 2301(6)(A)." Dkt. 37 at 16 (emphasis added). There are indicia in the record that a service contract was put in place at the time of sale, which is material to Count II and Count III. In Count II, the service contract may invalidate the Sale Contract's waiver of warranties as a violation of the limitations in 15 U.S.C. § 2308. If so, Lustine may be liable under an implied warranty of merchantability. In Count III, the service contract is itself alleged to be a written warranty when paired with service language in the Limited Warranty. The service contract must be characterized as such for Count III to survive.

Plaintiffs fail to show that the service contract was either: (1) a warranty; or (2) an agreement with Lustine. First, contrary to Plaintiffs' claim, a service contract is not a written warranty in this instance. And a service contract does not automatically morph into a warranty when discussed or referenced within one, as in the Limited Warranty.[5] The MMWA consistently treats service contracts as separate and distinct from written warranties. *See, e.g.,* 15 U.S.C. § 2306(b) ("Nothing in this title [] shall be construed to prevent a supplier or warrantor from entering into a service contract with the consumer *in addition to or in lieu of a written warranty...*") (emphasis added). Here, Plaintiffs' attempt to marry a service contract with a manufacturer's written limited warranty, to create a separate written warranty, must fail. Accordingly, the service contract at the time of sale is not a basis for an express warranty claim against Lustine, and Count III cannot survive.[6]

---

[5] For the reasons stated here, the Court recognizes the presence of a service contract and its importance within the analysis, but declines to consider the alleged "Service Warranty" as a separate warranty for consideration.

[6] Ultimately, this failure to create a warranty is moot due to the Court's finding that there was no breach of warranty or service contract.

Second, the service agreement—whatever its terms—appears to be with a third party, not Lustine. Indeed, the Sale Contract has a line item reference under "Other Charges (Seller must identify who is paid and describe purpose.)" that reads, "3) to 'WARRANTY SOLUTI' for 'SVC CONTRACT' $ '2891.00.'" Dkt. 32, Ex. 5 at Pls.' Doc. 1000217 (partial spelling original). Immediately above that entry, in line item (2), the payment of a $599.00 processing fee is "to 'LUSTINE DODGE.'" *Id.* As such, Lustine is listed as a payment recipient for the processing fee, but is not for the "SVC CONTRACT." Furthermore, the Limited Warranty from FCA US includes an "Optional Service Contract" through Chrysler Group LLC or Chrysler Service Contract Company LLC. The seller or dealership is not named as a potential service contract holder. And, "[these contracts] compliment [sic] but don't replace the warranty coverages outlined in [the Limited Warranty] . . . Ask your dealer for details." Dkt. 32, Ex. 6 at 34. Such a contract through Chrysler Group LLC is not established also as a warranty from the dealership. Overall, this circumstantial evidence suggests a service contract *is* reflected in the Sale Contract, but *is not* an agreement directly between Plaintiffs and Lustine and would not invalidate the Sale Contract's waiver.

Indeed, the MMWA specifically provides for dealerships to provide service under warranty without being a cowarrantor. The record is consistent with this. Section 2307 allows a warrantor—manufacturer FCA US in this case—to "designat[e] representatives to perform duties under the written or implied warranty . . . but no such designation shall relieve the warrantor of his direct responsibilities to the consumer or make the representative a cowarrantor." 15 U.S.C. § 2307. Further, the Sale Contract expressly separates Lustine as Seller-Creditor from "any warranties covering the vehicle that the vehicle manufacturer may provide." Dkt. 32, Ex. 5 at Pls.' Doc. 1000220. The Court is not privy to the terms of the service contract in question, and

9

cannot hold as a matter of law that Lustine is or is not intended as a representative within the meaning of § 2307.[7] Regarding the service contract, as noted above, the Court finds it does not create an express warranty and, at most, might sustain an implied warranty claim against Lustine under Count II.

In sum, the Court will consider FCA US's promises to Plaintiffs pursuant to both the express Limited Warranty and an implied warranty of merchantability. Having determined that only FCA US extended an express warranty, and that there is no operative "Service Warranty" defined in the record as named in Count III, the Court need only consider Lustine's warranty liability as to an implied warranty of merchantability in Count II. Even then, the circumstantial evidence suggests Lustine's Sale Contract is valid as to the implied warranty waiver.

With these conclusions, the Court considers Plaintiffs' claims in turn.

## A. Count I: Breach of Express Warranty

It is undisputed that Defendant FCA US provided an express Limited Warranty for Plaintiffs' 2015 Dodge Ram 1500. Plaintiffs argue Defendant breached the Limited Warranty by refusing to cover the repairs to the Vehicle after the engine failed in August 2018.[8] The Powertrain Limited Warranty covers the portions of the diesel engine in question,[9] Plaintiffs say, and it applies here because Defendant is responsible for the engine failure. Plaintiffs maintain

---

[7] The § 2307 representative question need not be resolved here, as the implied warranty claim fails as a matter of law.

[8] Because FCA US is the only Defendant relevant to ultimate liability for express warranties, the Court refers to FCA US as the singular "Defendant" for purposes of Section III.A.

[9] "What's Covered Under Chrysler Group LLC's Warranties . . . **Diesel Engine:** cinder block and all internal parts; cylinder head assemblies; core plugs; fuel injection pump and injectors; intake and exhaust manifolds; oil pan; oil pump; timing gear drive belts and/or chains and cover; turbo-charger housing and internal parts valve covers; water pump and housing; seals and gaskets for listed components; glow plugs and all sensors." Dkt. 32, Ex. 6 at 11 (emphasis original).

that the engine failed due to oil starvation and failure of the number five rod bearing. Their modifications cannot justify refusal of coverage, Plaintiffs say, because the lubrication problem was not due to Plaintiffs' alterations.

Defendant contends there is insufficient evidence to show engine failure due to a defect originating from FCA US, and that Plaintiffs' expert witness testimony—the only evidence to suggest Plaintiffs' claim for the failure—is inadmissible. Defendant's expert, Joseph Morton, states, "the modifications to the software of the vehicle was outside the specifications that Chrysler warrants this vehicle under and that the added stress, torque, and rpms of that modification was outside FCA's specifications of this vehicle and that contributed to the failure." Dkt. 32-15, Morton Dep. 83:21-84:5. This, Defendant says, is dispositive and Plaintiffs' causation position must fail.

While much of the record is aimed at the causation question, the Court need not determine the actual cause of the instant engine failure. The question is whether Defendant's denial of coverage was proper based on the governing documents. The Parties each submit expert reports and expert testimony to illustrate the specifics of the modifications to the Vehicle discussed herein, and the damage to the engine. The Court considers the record in full to assess Defendant's restriction of the Limited Warranty.[10]

Aside from causation, Plaintiffs further assert that they "were not bound to maintain the vehicle in accordance with the Owner's Manual or Diesel Supplement, as neither document was incorporated into the sale documents, nor constitutes a binding portion of the warranty." Dkt. 37 at 12. Defendant disputes this, saying there is express incorporation of the General and

---

[10] Defendant argues at length that Plaintiffs' expert reports and testimony from Justin Farmer are inadmissible. The Court is cognizant of these arguments, but finds it would be premature to exclude the evidence at the summary judgment stage.

Scheduled Maintenance Service guidelines. Dkt. 42 at 7 (citing Implied Warranty, Ex. 3 at 35).[11] Because of Plaintiffs' alleged failure to maintain the Truck within the bounds of the Owner's Manual, Defendant continues, the Limited Warranty gives FCA US the ability to restrict the scope of the warranty.

The Court agrees with Defendant. Proper maintenance is required throughout the Limited Warranty for coverage, regardless of establishing the cause of the damage. *Compare* Dkt. 32, Ex. 6 at 14 ("Your warranties don't cover the costs of repairing damage caused by poor or improper maintenance."), *with id.* at 17 ("Chrysler may restrict the warranty on your vehicle if the vehicle is not properly maintained . . . If the warranty is restricted, coverage may be denied or subject to approval by Chrysler before covered repairs are performed."). Ultimately, Defendants cite the most explicit incorporation of the Owner's Manual: "[f]ollow the instructions contained in the General and Scheduled Maintenance Service guidelines in your Owner's Manual." *Id.* at 35.

The upshot is that the Owner's Manual applies for purposes of Limited Warranty coverage, and it reiterates, "[y]our vehicle's Powertrain Control Systems can detect and store information about vehicle modifications that increase horsepower and torque output such as whether or not performance-enhancing powertrain components . . . have been used." Dkt. 32, Ex. 10 at 8. The determination of whether a repair will be covered by the Limited Warranty may draw on this information. *Id.* at 9. In other words, if certain modifications or improper maintenance is evident to the warrantor, it can restrict coverage of repairs based on that information. This goes directly to Mr. Morton's testimony above, that the modifications at issue

---

[11] Docket No. 32, Exhibit 6, and Docket No. 42, Exhibit 3 are both copies of the Limited Warranty. With limited exceptions, the Court refers to Docket No. 32, Ex. 6 for consistency.

were outside the specifications under which FCA US warrants the vehicle. Dkt. 32-15, Morton Dep. 84:1-2.

Furthermore, Plaintiff Illges claims he "noticed a hot, ambient feel near the Vehicle's engine" in 2015. PUF ¶ 4. Based on Plaintiffs' assessment of the Vehicle, "Mr. Illges had to 'delete' the Vehicle's current EGR system and install the newly purchased PPEI EcoDiesel Single Tune software update," due to safety concerns. *Id.* ¶ 9. Plaintiffs' conduct thus plainly contradicted the Owner's Manual, which states: "CAUTION! Failure to properly maintain your vehicle or perform repairs and service when necessary could result in more costly repairs, damages to other components or negatively impact vehicle performance. *Immediately have potential malfunctions examined by an authorized dealer or qualified repair center.*" Dkt. 32, Ex. 9 at 754.

Importantly, there is no dispute that Plaintiffs modified the Vehicle in a way that allowed for increased performance, allowing restriction of coverage pursuant to Section 3.8 of the Limited Warranty. Dkt. 32, Ex. 6 at 17. It is stipulated in the record that Plaintiff Illges installed or downloaded a PPEI EcoDiesel Single Tune software update for the Truck "that included an additional 60 horsepower." Dkt. 29. Plaintiff Illges' Facebook feed also shows various alterations; a September 4, 2016 post says, in part, "AFE intake and 60hp & 115 ft/lbs of torque tune. Roughly 300hp and 535 ft/lbs of torque and still make 22+ mpg's." Dkt. 42, Ex. 2 at 2. While Plaintiffs dispute the actual effect of this software, the performance enhancement aspects of the modification are clear in the record; the Owner's Manual is equally clear: "[information about] vehicle modifications that increase horsepower and torque output . . . may be used to determine if repair will be covered by New Vehicle Limited Warranty." Dkt. 32, Ex. 10 at 8-9.

Plaintiffs' expert, Justin Farmer, refers to the air intake Plaintiff Illges installed on the Vehicle as a "quote, unquote 'performance modification,'" discounting the possibility it could cause the failure. Dkt. 37-7, Farmer Dep. 73:15-16. But Mr. Farmer does not provide factual support for such a determination. He then testified as follows:

Q: Do you know what the factory specifications on the horsepower of the engine is absent any modification of the air intake?
A: Around about area of 300 horse[power].
Q: Okay, and how many pounds of torque is within the baseline specifications?
A: Somewhere in the area of 400-450-foot-pounds.
Q: Okay. Did you – do you know or did you do anything to determine how much additional horsepower or torque pressure is added as a result of the installation of the air intake on the vehicle?
A: On his, in particular?
Q: Yes.
A: I did not research any of that.

Dkt. 37-7, Farmer Dep. 76:21-77:6. While Mr. Farmer refers to the Vehicle's power enhancement as something of little significance, Plaintiff Illges announced the enhanced specifications on Facebook, including the jump from 240 to 600 horsepower, and the updated total of 535 ft/lbs of torque. Dkt. 42, Ex. 2 at 2. Ergo, Plaintiff Illges far exceeded the maximum 400-450 ft/lbs of torque to which his own expert testified. This disparity underlies Mr. Farmer's conclusory finding that the modifications were negligible as to the engine damage.

While the addition of 60 horsepower and 115 ft/lbs of torque to the Truck's engine is enough to justify Defendant's refusal of coverage, Plaintiffs did more. In addition to adding power to the engine, Plaintiffs deleted the EGR system on the Truck in August 2016, altering it such that it could operate without the emissions system.[12] In early 2017, Plaintiff Illges installed

---

[12] Plaintiff Illges also announced on his Facebook feed that he was "beta testing an EGR delete." Dkt. 42, Ex. 2 at 2-3. Characterizing such a modification as a "beta test" suggests a lack of experience with the software and a level of uncertainty as to the ultimate effect on the Vehicle. What is more, Plaintiff Illges also posted that "[his] truck desperately doesn't want to be deleted!

an AFE-brand oil filter to replace the original dry filter, which was in place until the August 2018 failure. Dkt. 32-14, Illges Dep. 38:5-39:3. The existing dual exhaust was changed into a single exhaust, and Plaintiff Illges put in all metal intercooler MDRP pipes around the same time as the AFE filter. *See id.* at 39:13-41:21.

Due consideration of the record establishes, without any issue of material fact, that Defendants had a right to restrict coverage based on the language of the Limited Warranty and Owner's Manual.

### B. Count II: Breach of Implied Warranty

In Virginia, "[u]nless excluded or modified (§ 8.2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Va. Code Ann. § 8.2-314(1). Section 8.2-316 explains that, subject to exceptions, "to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by writing and conspicuous." *Id.* § 8.2-316(2). Here, there is such a conspicuous, written exclusion of an implied warranty as described under Virginia law. Dkt. 32, Ex. 5 at Pls.' Doc. 1000220.

Having said that, Section 2308 of Title 15 of the United States Code addresses implied warranties, and restricts disclaimers or modifications to implied warranties according to the following: "No supplier may disclaim or modify . . . any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer product, or (2) at the time of sale, or within 90 days

---

The V-Band bolt is in the least conducive spot for this process!" *Id.* at 4. Plaintiff concedes that the Vehicle is not conducive as manufactured to the deletion, which he ultimately executed.

15

thereafter, such supplier enters into a service contract with the consumer which applies to such consumer product." 15 U.S.C. § 2308(a)(1-2). Further, a disclaimer in violation of this section is inapplicable for purposes of both the federal statute and state law. *Id.* at § 2308(c).

As discussed above, the record fails to characterize the service contract included for the Vehicle at the time of sale. As a result, it is uncertain whether § 2308(2) renders the implied warranty disclaimer invalid as to Lustine, or if § 2307 applies, relieving Lustine of implied warranty liability. Assuming there is an implied warranty as to at least one Defendant, the Court must determine if Plaintiffs have shown a breach of the implied warranty of merchantability under Virginia Law.

"The statute further defines 'merchantable goods' as being of a quality that would 'pass without objection in the trade under the contract description' or which 'are fit for the ordinary purposes for which such goods are used.'" *Hubbard v. Dresser, Inc.*, 624 S.E.2d **1, **5 (Va. 2006) (quoting Va. Code § 8.2-314). Here, Plaintiff Illges testified, "[u]p until the failure, the vehicle was in perfect working – working order and perfect health." Dkt. 32-14, Illges Dep., 62:20-22. Moreover, the Truck had over 70,000 miles on it at the time of engine failure. *Id.* 25:16. Given that the Vehicle "had accumulated approximately 22,400 miles" at the time of the PPEI EcoDiesel Single Tune software update, the engine sustained over 48,000 miles with the new software before failing. Dkt. 42 at 10. Further, Plaintiffs submit that Plaintiff Illges checked the oil periodically, and does not recall oil level ever being abnormal. Dkt. 32-14, Illges Dep. 34:7-13. As the Truck was modified with non-Chrysler parts at the time of failure, and Plaintiff Illges reports it was in perfect working order and perfect health prior to the failure, the Truck was "merchantable" within the meaning of Virginia law.

16

It is true that the "FCA issued a safety recall on the Vehicle's EGR in Fall 2019, which included the Vehicle's VIN number." PUF ¶ 6. The only reason the recall did not affect the Vehicle in this case was that Plaintiffs had already removed the EGR part at issue at the time of the recall. "FCA has also issued a recall and service bulletin changing the type of oil to be used from 5W-[30] to 5W-40," PUF ¶ 7, where 5W-40 "basically maintains its viscosity at higher temperatures." Dkt. 38-1, Morton Dep. 72:12-13. In other words, this was a change to thicker oil, which took place after Plaintiffs purchased the Vehicle. *Id.* at 72:16-22. Neither one of these recall adjustments render the vehicle unmerchantable or unfit for use – on these facts, the 5W-40 oil update is the only one that has a potential effect on Plaintiffs' Vehicle. The 5W-40 was implemented "early on in the engine's life, so it has been running with a 5-40 for 50,000 miles . . . [the 5W-30] would not have any effect on this engine at this time." *Id.* 77:10-15.

Plaintiffs fail to offer evidence to raise a genuine issue of material fact on the recall issues, and the overall lubrication of the Vehicle's engine. They submit to the Court the Vehicle was in perfect health prior to the failure, which was nearly 50,000 miles after it was modified from its FCA US factory specifications. For these reasons, there is no evidence that Defendants breached an implied warranty.

## C. Count III: Breach of Service Warranty, as to Dealership Defendant

Count III alleges a breach of "Service Warranty" against Lustine in addition to the alleged breaches of express and implied warranty. As noted above, the Court will assume, *arguendo*, that a service contract existed at the time of the sale for purposes of implied warranty waiver under 15 U.S.C. § 2308(a)(2). Also discussed above, however, is the legal difference between a service contract and a warranty. Plaintiffs conjure up a "Service Warranty" here by combining the alleged service contract with FCA US's written limited warranty. While they

17

blend them together in the abstract, they fail to show how the existence of the two things is cognizable as a third type of warranty. And there are no terms of this alleged service contract before the Court to assess a possible breach.

What is more, the claimed Service Warranty is completely derivative of the Limited Warranty, which is addressed and resolved in Count I. Plaintiffs cannot carve out another warranty this way. Plus, Plaintiffs argue that "the Warranty is an 'express warranty,' a 'written warranty,' and a 'service contract,' as those terms are defined in Va. Code § 8.2-313 and 15 U.S.C. § 2301(6)(B) & (8)." Compl. ¶ 56. It is established by now that warranties and service contracts are treated as distinct things in the statutory language. The overlapping definitions in this allegation are a telling illustration of the overlap Plaintiffs are attempting in Count III.

This count is unsupported and thus unsuccessful.

### D. Count IV: Violation of Virginia Consumer Protection Act

Section 59.1-200 of the Virginia Consumer Protection Act ("VCPA") declares it is unlawful for a supplier in connection with a consumer transaction to misrepresent that goods or services are of a particular standard, quality, grade, style, or model; or to misrepresent that repairs, alterations, modifications, or services have been performed or parts installed. Va. Code § 59.1-200(A)(6), (10). For the reasons stated above, there is no misrepresentation in the instant case, nor any complaints from Plaintiffs about the Vehicle prior to Plaintiffs' modifications with non-Chrysler parts. There is no genuine issue of material fact to suggest that Defendants violated the VCPA.

Finally, Virginia law allows limitations on consequential damages, and there is a valid limitation in the case at bar excluding recovery thereof. *Id.* at § 8.2-719(3) ("Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable."). The

18

limited warranty clearly states, in Section 1, "Incidental and Consequential Damages Not Covered," that these types of damages are not eligible for warranty when "connected to vehicle failure, either while under warranty or afterward." Dkt. 32, Ex. 6 at 4. Plaintiffs fail to demonstrate that this provision is unconscionable or otherwise unenforceable. As a result, there is no valid claim for these types of damages in this case.

## IV. CONCLUSION

Accordingly, as summary judgment is granted in favor of Defendants, Plaintiffs' Complaint (Dkt. 1-1) is hereby **DISMISSED**. Judgment shall enter by separate order of the Court pursuant to Federal Rule of Civil Procedure 58(a). Plaintiffs' time to appeal shall begin on the date of that entry.

It is **SO ORDERED**.

April 16, 2020
Alexandria, Virginia

_____
Liam O'Grady
United States District Judge

19